IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**TRI-STATE THERMO KING, INC.**

                          **PLAINTIFF**

VS.                CASE NO. 4:22-CV-00771-JM

**ALLIED PROPERTY & CASUALTY
INSURANCE COMPANY**

                          **DEFENDANT**

_____

**VIDEOCONFERENCED ORAL DEPOSITION**

**OF**

**JODY BAILEY**
_____

July 6, 2023

Tri-State Thermo King
1420 Stonebrook Avenue
Memphis, Tennessee 38116

**Shyloa Myers, RPR, CCR**
**Arkansas Lic. No. 710**

EXHIBIT 2

```
 1            (Deposition commences at 9:01 a.m.)
 2                        PROCEEDINGS
 3                        JODY BAILEY,
 4         Called as a witness, having been first duly
 5   sworn to tell the truth, the whole truth, and nothing but
 6   the truth, was examined and testified as follows:
 7                        EXAMINATION
 8   BY MS. YOUNG:
 9   Q.    Good morning, Mr. Bailey.  My name is Regina Young,
10   and I'm going to be taking your deposition today.
11         Would you go ahead and state your name for the
12   record.
13   A.    Jody Bailey.
14   Q.    Where do you live, Mr. Bailey?
15   A.    Olive Branch, Mississippi.
16   Q.    How -- first of all, have you ever given a
17   deposition before today?
18   A.    Yes.
19   Q.    Okay.  Have you ever given a Zoom deposition before
20   today?
21   A.    Yes.
22   Q.    Okay.  Well, let's -- just for a minute, let's talk
23   about that.
24         How many depositions have you given before today?
25   A.    Just one.
```

```
1    Q.    Okay.  And what was that for?
2    A.    I assumed it was a deposition.  The previous
3    counsel for Nationwide Insurance.
4    Q.    Okay.  So, yeah, it's similar to this.  I was -- an
5    Examination Under Oath.
6    A.    Okay.  Sorry.
7    Q.    And so -- yeah.
8    A.    Sorry.
9    Q.    No problem.
10         And I understand that that examination was also
11   taken via Zoom, correct?
12   A.    Yes.
13   Q.    Okay.  What is the address where you currently are
14   right now?
15   A.    1420 Stonebrook Avenue, Memphis, Tennessee 38116.
16   Q.    And is that where you work?
17   A.    Yes.
18   Q.    Where do you work?
19   A.    Tri-State Thermo King.
20   Q.    Is there anyone else in the room with you there?
21   A.    No.
22   Q.    Tri-State Thermo King is the plaintiff in this
23   lawsuit against Allied Property and Casualty Insurance,
24   correct?
25   A.    Yes.
```

```
1    Q.    Okay.  What is your job title with --
2    A.    I'm the president.
3    Q.    What do you call the company?  Do you call it
4    Tri-State?  Or Thermo King?
5    A.    Tri-State Thermo King.
6    Q.    Okay.  So you say "Tri-State Thermo King"?
7    A.    Yes.
8          We have -- I'm at the home office.  We have four
9    locations:  Little Rock, Arkansas; Russellville,
10   Arkansas; Memphis, Tennessee; and Nashville, Tennessee.
11   Q.    So Memphis and Nashville?
12   A.    Yes.
13   Q.    And the headquarters are in Memphis?
14   A.    That's correct, yes.
15   Q.    How long have you worked for Tri-State Thermo King?
16   A.    Since December of 2008.
17   Q.    And you said you're the president?
18   A.    Yes.
19   Q.    Who do you report to?
20   A.    The owner is Michael Rivalto.
21   Q.    Have you always worked out of the headquarters
22   there in Memphis?
23   A.    Yeah.  I travel to all the locations, but the
24   majority of my time is in Memphis.
25   Q.    What's your travel schedule to the other locations?
```

```
1    A.    It just varies when needed.
2    Q.    So the property that is the -- or the location
3    that's the subject of the lawsuit is in Little Rock,
4    and -- or it's actually North Little Rock; is that right?
5    A.    Yes.
6    Q.    Okay.  It's 10600 Maybelline Road in North
7    Little Rock, Arkansas?
8    A.    That's correct.
9    Q.    Is it okay with you today if I refer to that as the
10   "subject property"?
11   A.    Yes.
12   Q.    How -- when was the last time you were at the
13   subject property?
14   A.    It's probably been about a month ago.
15   Q.    And why were you there a month ago?
16   A.    Just checking on everything, day-to-day operations.
17   Q.    So your deposition -- before we get too far into
18   the questions, the deposition will probably take several
19   hours; so if you need a break at any time, just let me
20   know.
21   A.    Okay.
22   Q.    And we'll take a break as long as there's not a
23   question pending.  So, if I've asked a question, I'll
24   want you to go ahead and answer that question before we
25   take a break.
```

```
1    A.    Okay.
2    Q.    But, other than that, we can take as many breaks as
3    you want throughout the day.
4    A.    Okay.
5    Q.    If you don't understand any question that I ask,
6    please let me know; and I'm going to rephrase it until we
7    get it to a point that you and I are communicating.  It's
8    important that you understand what I'm asking.  So, if
9    you don't understand, please tell me; it won't offend me.
10         If you do answer my question, then I'm going to
11   assume that you understand my question.
12         Your deposition was scheduled for last Friday, and
13   Derek told us that you had a procedure scheduled that day
14   with your dermatologist.
15         I don't -- I'm not going to ask you about that, but
16   I just want to check and make sure that you're feeling
17   okay today to give your deposition?
18   A.    Yes.  You can probably see my scar on my face.
19   Q.    It looks fine to me.
20         Are you under the influence of -- or are you taking
21   any medication --
22   A.    No.
23   Q.    -- taking any medication that's going to interfere
24   with your ability to give your deposition today?
25   A.    No.
```

1             (Exhibit 1 marked for identification.)
2    Q.   Okay.  So I'm going to attempt to screen share
3    here.
4         And, Mr. Bailey, I have a -- can you see my --
5    A.   Yes.
6    Q.   -- or the document that I've screen shared there?
7         Okay.  So I've marked as Exhibit 1 the Third
8    Amended Notice of Oral Rule 30(b)(6) Deposition.
9         Have you seen this document?
10   A.   No.
11   Q.   I'm going to scroll down.  This is a several-page
12   document.  This is a notice, and this is actually the
13   Third Amended Notice; and I changed it for today's date
14   and time.  But I had previously sent this notice to your
15   attorney probably three or four times when we were
16   working to schedule your deposition.
17        And it has a list of 21 topics.
18   A.   Oh, yes.  I have seen that.  I'm sorry.
19   Q.   Okay.  So you have seen the -- if not the Third
20   Amended Notice with today's date --
21   A.   Right.
22   Q.   -- but you have a list of 21 topics?
23   A.   Yes.  I'm sorry.
24   Q.   No worries.
25        Are you prepared to testify about all of these

1  A.     I don't know the exact time.  It was after lunch
2  because we had lunch at Tri-State Utility, so I would say
3  between lunch and early afternoon.
4  Q.     Does Mr. Hart know that you -- that Tri-State has
5  made an insurance claim related to this storm?
6  A.     Not to my knowledge, he does not.
7  Q.     You've never discussed that with him?
8  A.     No.
9  Q.     Did you know that afternoon if the building had
10 sustained any damage as a result of that storm?
11 A.     No.
12        As far as hail damage?  I guess -- let me rephrase
13 that in answer to that question.
14 Q.     Yeah.
15 A.     As far as hail damage to the roof, no.  I -- like I
16 said before, I did see a leak in one of the bays that I
17 was standing in before I went inside.
18        To access our roof, you would either have to have
19 an extremely long ladder or a scissor lift; so,
20 obviously, nobody was up there during the storm to check
21 everything out.
22 Q.     Sure.
23        How many bays that -- there are two buildings,
24 right?
25 A.     Yes.

```
 1   Q.    But, if we look at the Property Loss Notice, it
 2   does report that the contact was Jody Bailey?
 3   A.    Correct.
 4         I don't know if I sent that directly to DeAnna or
 5   if Tara Walter in my office did.  But, if Tara Walter
 6   sent it, it was on my behalf; and I would have told her
 7   that I would be the contact for the insurance company to
 8   contact.
 9   Q.    And you would have given Tara Walter the
10   information to provide to Kemmons Wilson Insurance Group?
11   A.    Yes.
12   Q.    So, if you didn't contact Kemmons Wilson yourself,
13   you provided the information to Tara so that she could
14   report it to Kemmons Wilson?
15   A.    Yes.
16   Q.    Got it.  Okay.
17         Any reason to dispute the date of the notice:
18   July 27, 2020?
19   A.    No.
20   Q.    Okay.  Now, the date of loss and time that was
21   reported to Kemmons Wilson was July 9, 2020; so that date
22   would have come from you, correct?
23   A.    I would assume so, yes.
24   Q.    Okay.  So why did you report a loss date of July 9,
25   2020?
```

1   A.     I don't remember why I would have that date.
2          The day I was there is the date that I thought was
3   the date on the claim.  I was there on June 23 I know for
4   a fact; so that would have been the date of the leaks, in
5   my opinion, from the hail damage.
6   Q.     So why didn't you report June 23?
7   A.     I don't know why it's reported as June 9 on that
8   form.
9   Q.     July 9?
10  A.     I'm sorry.  July 9.
11  Q.     Had you forgotten about the June 23 storm?
12  A.     No.
13         Because I was there personally.
14  Q.     But you just can't remember why you reported July 9
15  instead of June 23?
16  A.     No, I don't remember.
17  Q.     So let's get -- scroll down a little bit to the
18  "Description of Loss and Damage."
19         It says:  "Contractor discovered roof damage when
20  inspecting the building.  Best guess was storm damage
21  from July 9."
22         So it was a contractor who discovered the roof
23  damage.  Was that Hoyt Hayes Construction?
24  A.     Yes.
25  Q.     Do you know the date that Hoyt Hayes Construction

```
 1  discovered the roof damage?
 2  A.    No.
 3  Q.    Why were they inspecting the building?
 4  A.    Like I said before, I saw a leak in the bay when I
 5  was there.  It was hailing that day in a heavy storm.  As
 6  I told you before, any kind of exterior roof leaks or
 7  anything, we call Hoyt Hayes.  And he went and did an
 8  inspection and discovered the hail damage.
 9  Q.    Whose best guess was it that the storm damage
10  occurred on July 9?
11  A.    I would assume, since it says the contractor
12  discovered that roof damage, that's his best guess.  I
13  don't know if he was there that day and another storm hit
14  or why he has that date.  That would be a question for
15  Josh Hayes.
16  Q.    Well, if you had told Josh Hayes that there was a
17  storm on June 23 that you observed, then don't you think
18  that would have been the date that he would have
19  reported?
20  A.    Yes.
21  Q.    So did you tell him that you personally observed
22  the storm on June 23?
23  A.    Yes.
24  Q.    Well, then why did you guess that the damage
25  occurred on July 9?
```

```
1    Q.    Has anyone told you that there was a problem with
2    the gutter system in the building, and that was what was
3    causing the leaks?
4    A.    No.
5    Q.    Were you aware that that's what William Griffin
6    testified in his Examination Under Oath?  That he agreed
7    that the leaks that were repaired by Riley Hays were
8    unrelated to the storm?
9    A.    No.
10   Q.    Okay.  What evidence does Tri-State have that the
11   repairs that were made by Riley Hays were related to the
12   storm?
13   A.    We don't have any.  We didn't hire Riley Hays
14   directly.
15   Q.    So they were hired by Hoyt Hayes?
16   A.    Correct.
17   Q.    And you've told me that you've never inspected the
18   roofs of the buildings, right?
19   A.    Correct.
20   Q.    Has any owner, officer, or employee of Tri-State
21   ever inspected the roofs?
22   A.    No.
23   Q.    So there was no inspection done by Tri-State of the
24   roofs before they purchased the buildings?
25   A.    No.
```

1  Q.   And, at any time since this June 23, 2020, storm,
2  nobody from -- or no one who works for or who is employed
3  by Tri-State has been on top of the roof; is that right?
4  A.   Not to my knowledge, no.
5  Q.   Okay.  Does Tri-State have any photographs or
6  documents showing what the roofs looked like before it
7  purchased the property?
8  A.   Not that I'm aware of.  There could be some
9  pictures maybe on the appraisal, if they took any.  I
10 don't know if they did any roof pictures at the time, but
11 that would be the only ones that I would know of.  We did
12 not take any ourself.
13 Q.   Does Tri-State have any photographs or documents
14 showing what the roofs looked like before October 31,
15 2019?
16 A.   No.
17 Q.   Who has inspected the roofs since Tri-State has
18 owned the buildings?
19 A.   Hoyt Hayes Construction.
20 Q.   How many times has Hoyt Hayes Construction
21 inspected the roofs?
22 A.   I don't know.  You would have to ask him that
23 question.
24            MS. YOUNG:  We've been going a little bit
25       over an hour.

1  Q.    Other than denying the claim, does Tri-State have
2  any complaints about Allied's or Nationwide's handling of
3  the claim?
4  A.    Not to my knowledge, no.
5  Q.    What does Tri-State know about Hoyt Hayes
6  Construction's communication- -- communications with
7  Allied or Nationwide about the claim?
8  A.    We don't.
9  Q.    Has anyone from Hoyt Hayes Construction told you
10 that Greta Michael made any misrepresentations about the
11 claim?
12 A.    No.
13 Q.    Has anyone from Hoyt Hayes Construction complained
14 to you about any communications or Greta Michael's
15 handling of the claim?
16 A.    No.
17 Q.    So I want to talk to you about the specific claims
18 that were brought against Allied in the lawsuit.  And the
19 first one in the Complaint is negligence, is a negligence
20 claim.
21       I don't know if you know what that means.
22 A.    No.  Go ahead; tell me what --
23 Q.    Okay.
24 A.    -- what it . . .
25 Q.    Well, in the Complaint, Tri-State alleges that

```
 1   Allied failed to ensure that the property damage was
 2   properly adjusted?
 3   A.    That's correct, yes.
 4   Q.    Okay.  And what did they do or not do to --
 5   regarding their adjustment of the claim?
 6   A.    They claim there was no hail damage to the roof.
 7   Q.    So is it just the fact that they denied the claim?
 8   A.    Yes.
 9   Q.    Is that how they were negligent?
10   A.    Yes.
11   Q.    Okay.  Same with Breach of Contract?  Is it just
12   that -- the fact of the denial, is that how they breached
13   the contract?
14   A.    Yes.
15   Q.    Now, a big part of Tri-State's Complaint against
16   Allied alleges violations of the Arkansas Trade Practices
17   Act.
18         And we can probably short-circuit a lot of
19   questions about that specific claim if it is Tri-State's
20   testimony that the violation of the Trade Practice Act
21   was simply the denial of the claim.
22         Is that Tri-State's position?
23   A.    Yes.
24   Q.    Okay.  So Tri-State is not aware of any
25   misrepresentations by Allied, correct?
```