```
1             IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF ARKANSAS
2                     CENTRAL DIVISION

3   ------------------------------------------------------

    TRI-STATE THERMO KING, INC.                   PLAINTIFF
4

    VS.                CASE NO. 4:22-CV-00771-JM
5

    ALLIED PROPERTY & CASUALTY INSURANCE
6   COMPANY                                       DEFENDANT

7   ------------------------------------------------------

8       ORAL DEPOSITION OF ROBERT MICHAEL THOMPSON

9                    June 19, 2023
                    (Taken by Zoom)
10

11  ------------------------------------------------------

12             A P P E A R A N C E S

13

    ON BEHALF OF THE PLAINTIFF:
14
    DEREK L. FADNER, ESQ.
15  McClenny Moseley & Associates, PLLC
    MMA Law Firm
16  1415 Louisiana Street
    Suite 2900
17  Houston, Texas  77002

18


19
    ON BEHALF OF THE DEFENDANT:
20
    KYLE R. WILSON, ESQ.
21  Wright, Lindsey & Jennings LLP
    200 West Capitol
22  Suite 2300
    Little Rock, Arkansas  72201

23


24
    Zoom technician:  Payton Dawson
25
```

EXHIBIT 4

1                 ROBERT MICHAEL THOMPSON,
2    the witness hereinbefore named, having first been
3    duly cautioned and sworn or affirmed to tell the
4    truth, the whole truth and nothing but the truth,
5    testified as follows:
6                        EXAMINATION
7    BY MR. WILSON:
8    Q.    Can you state your full name for the record,
9    please.
10   A.    Robert Michael Thompson.
11   Q.    Mr. Thompson, my name is Kyle Wilson.  I work
12   for a law firm in Little Rock, Arkansas called
13   Wright, Lindsey and Jennings.
14         I'm going to take your deposition today.
15   You've been designated as an expert witness in a
16   lawsuit that's been brought in the Eastern District
17   of Arkansas, Central Division, which is Little Rock.
18         Are you aware of the fact that you've been
19   designated as an expert witness by the Plaintiff?
20   A.    Yes.
21   Q.    Okay.  I actually don't know when this matter
22   is set for trial.  I'm assuming somebody over here
23   does.
24         Is it your understanding, your anticipation
25   to appear at trial and testify?

```
 1                Did I read that correctly?
 2    A.    You did.
 3    Q.    It says that you're the PE executive engineer.
 4    Are there other classifications of engineers at
 5    Wallace and Todd?
 6    A.    No.
 7    Q.    Did anyone accompany you when you visited the
 8    site on 26 January '22?
 9    A.    No.
10    Q.    If you go under Background, it says, The
11    following information was gathered from conversations
12    with Mr. Fadner -- that's Derek Fadner -- plaintiff's
13    counsel?
14    A.    Yes.
15    Q.    And documents provided to Wallace and Todd
16    prior to the inspection.
17                What documents were provided to you prior
18    to the inspection?
19    A.    That was an estimate for repairs, I believe,
20    and that was all.  Oh, I do believe that there was a
21    weather report.
22    Q.    Okay.  If you'll look at page 8 of your report,
23    there are appendices listed?
24    A.    Yes.
25    Q.    So Appendix A is Hoyt Hays estimate?
```

1  A.    Yes.
2  Q.    Appendix B is Wallace and Todd photographs.
3  Appendix C is Weather Report.
4        Are those the, those the documents, the
5  Hoyt Hayes estimate and the weather report, the
6  documents that you were provided?
7  A.    Yes.
8  Q.    Any other documents?
9  A.    No.
10 Q.    Did you have conversations with anyone who was
11 present at the loss location on the, on the day of
12 the alleged loss?
13 A.    Only to the effect of introducing myself and
14 letting them know that I was there and was going to
15 be on the roof looking around, and that would have
16 been the people at the front desk.  And that was the
17 extent, I believe.
18 Q.    Did you ask them, ask anybody at the loss
19 location employed by Tri-State Thermo King or anyone
20 associated with them about events that occurred on
21 the alleged date of loss?
22 A.    No, I did not.
23 Q.    Did you have any conversation with anyone from
24 Hoyt Hayes, Haynes, rather?
25 A.    I did call them and ask them about the

1  estimate, and that was it.  I don't recall the exact
2  date that I did that.
3            I just asked them if that was their final
4  estimate on that.
5  Q.   Is that all you asked them, "Is this your final
6  estimate?"
7  A.   Yes, yes.
8  Q.   And what did they say?
9  A.   Yes, that was it.
10 Q.   Did you make any sort of effort to confirm
11 whether or not the repair estimates developed by Hoyt
12 Hayes were correct --
13 A.   No, I did not.
14 Q.   -- or accurate?
15 A.   No, I did not.
16 Q.   Do you know a fellow named William Griffin?
17 A.   I'm sorry?
18 Q.   Yeah, do you know a fellow named William
19 Griffin?
20 A.   I have heard the name, but I've never met him
21 personally.
22 Q.   Who do you understand William Griffin to be?
23 A.   He is a public adjustor.
24 Q.   Do you know whether or not William Griffin had
25 any involvement with the loss or estimating the

1  Q.    No, I understand completely.  Thank you for
2  that.
3  A.    Okay.
4  Q.    Page eight, Conclusions and Recommendations.
5  Are you with me?
6  A.    I am.  Yes.
7  Q.    Under Conclusions and Recommendations you have
8  five numbered sentences.  Are these all the opinions
9  that you have prepared to date in this matter?
10 A.    Yes.
11 Q.    And I said they're all sentences.  Paragraph
12 one actually has two sentences in it, so I apologize
13 for that.
14        Paragraph one says, The metal roof at the
15 loss location is damaged by hail.  Due to the extent
16 of damage caused by hail, a full replacement is
17 warranted on Buildings 1 and 2.
18        Did I read that correctly?
19 A.    Yes, that's correct.
20 Q.    What is it about the -- what's the basis for
21 this opinion that due to the extent of damage caused
22 by the hail, caused by hail a full roof replacement
23 is warranted?
24 A.    I always recommend that anything that has hail
25 damage to it to be replaced.

1   Q.      So if you found one hail mark on the front side
2   of Building 1, you would recommend that the entirety
3   of the roof be replaced?
4   A.      I mean, let's be practical.  No, obviously not.
5   That's not something I would do.  But just based on
6   the amount of hail damage that I saw to the roof, I
7   would say that that's, I would do that.
8           I mean, I'm not, I'm not going to say, Hey,
9   there's two hits on a 10,000 square foot hail, you
10  know, roof.  It needs to be replaced.
11          Just the same way on a shingle roof, Hey,
12  you have one, you have one hit to your shingle roof.
13  It needs to be replaced.  That's, obviously, not, you
14  know, practical.
15  Q.      Okay.
16  A.      It's on a case-by-case basis.
17  Q.      Okay.  Did you give any consideration to the
18  propriety of repairs?
19  A.      Propriety?
20  Q.      Yeah, whether or not you can repair -- for
21  instance, with a metal roof, you agree with me that
22  the metal comes in sheets; correct?
23  A.      Correct.
24  Q.      If I've got a sheet that has a hail mark in it,
25  can I replace that sheet?

```
 1   A.      Sure you can.  If the -- depending on, you
 2   know, how the sheet is put in, you may have some
 3   trouble taking that sheet out and putting it in,
 4   depending on what type it is, but you can replace
 5   individual sheets, yes, if that's what you're asking
 6   me.
 7   Q.      That's what I'm asking.
 8   A.      Okay, yes.
 9   Q.      Okay.  Did you -- did anyone make an analysis
10   of what replacing the sheets where you saw hail
11   damage, how much that would cost?
12   A.      Not that I know of.
13   Q.      Do you think that that would be less than a
14   total replacement, that the cost of repairs would be
15   less than total replacement?
16   A.      I would think that it would be.
17   Q.      Okay.
18   A.      Just offhand, I would think that it would be
19   less.
20   Q.      Sure.
21           So what is warranted for a full roof
22   replacement, that's just a gut call you make case by
23   case?
24   A.      That's correct, yes.
25   Q.      You don't have any type of formula where if I
```

1  see "x" number of hail marks this should be replaced?
2  It's just you make a gut call?
3  A.    Yes.  I make a gut call, yes.
4  Q.    On.  Paragraph two, you discovered no evidence
5  to indicate that water intrusion damage reported
6  and/or observed was related to or caused by hail
7  damage to the roof panels.
8        Did I read that correctly?
9  A.    Yes.
10 Q.    Okay.  So you agree that no damage shown by any
11 photographs to the interior of the building at issue
12 were caused or resulted from hail strikes?
13 A.    That's correct.  I didn't see anything there.
14 Q.    Okay.  And let's look at some of the
15 photographs, so I can make sure that I understand.
16 That would include, and since you don't have the
17 Bates numbers, and that's how I have them referenced
18 in my outline, let me -- that would include
19 photograph nine?
20       No, this is the Hoyt Hayes Construction
21 report, which you have; correct?
22 A.    Which I have.  Their photograph nine?  Okay.
23 Is this the show in the office with the HVAC ceiling,
24 dropped ceiling?
25 Q.    Yes.  It shows dropped ceiling.  It shows water

1   marks.
2   A.    Yes, I see dropped ceiling and water marks.
3   Q.    Right.  You don't believe that's a result of
4   the hail impacts?
5   A.    I didn't see anything directly, and I don't
6   know exactly where this is, to be honest with you.
7   I'm assuming that's in the front.
8         I didn't see anything that would tell me
9   that there were breaches in that that would cause
10  that, no.
11  Q.    Let me do it this way.  If I see any photograph
12  that shows damaged interior to the building, is it
13  your opinion that that's not the result of hail, hail
14  strikes on the surface, on the top of the building?
15  A.    Yes.
16  Q.    Okay.  Number three is all roofing
17  appurtenances, i.e. coping dents, et cetera, should
18  be replaced at the time of the metal roof
19  replacement.
20        If there was such damage would that be
21  documented in your report?
22  A.    Yes.
23  Q.    Okay.  Number four, The hail damaged fence on
24  the HVAC unit should be combed.
25        Did I read that correctly?

1                Hopefully I'm answering that question.  I'm
2     just a little --
3     Q.    I don't think I'm doing a very good job asking
4     the question, so let me ask it one more time.
5     A.    Sure.
6     Q.    I understand that you weren't present on June
7     the 23rd of 2020.
8     A.    Uh-huh.
9     Q.    I also know that you have told me that you
10    can't place a date on any hail mark that you observed
11    at the loss location?
12    A.    Right.
13    Q.    Correct?
14    A.    Right.
15    Q.    And I apologize.  My phone rang.
16               What I'm asking you, from the standpoint of
17    forensic analysis by any weather consultant, have you
18    seen any evidence indicating that one-inch hail
19    actually occurred on June the 23rd of 2020?
20    A.    That's a difficult question.  Yes, I saw
21    evidence that hail occurred.  On that specific date,
22    again, I wasn't there.
23               All we can go by is what the weather says,
24    one-inch, and physical evidence that was there.  So
25    that's really about all I can answer, or how I can

1  answer that for you.
2  Q.    Other than the fact that you saw marks that you
3  believe would be consistent with one-inch hail have
4  you seen any other documentation that would suggest
5  or tell you that one-inch hail, in fact, occurred on
6  June 23rd of 2020?
7  A.    No.
8  Q.    If you go to the last bullet point, it says at
9  12:49 p.m. on June 23rd, 2020, National Weather
10 Service, Little Rock, Arkansas issued a severe
11 weather statement to update their severe thunderstorm
12 warning, which stated that up to .88 inches was now
13 expected, meaning hail.
14        Again, other than marks that you saw on the
15 roof, have you seen any evidence or documentation
16 that would prove to us that hail of a diameter up to
17 .88-inches occurred on June 23rd of 2020?
18 A.    Not on the roof, no.
19 Q.    Okay. Well, anywhere else, for that matter?
20 Because you didn't see any damage anywhere else; did
21 you?
22 A.    There was a car in the parking lot there, but
23 that's not -- you know, cars move. I took a picture
24 of the car that was in the parking lot that had dents
25 in the top of it.